**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

**MARK H. WILLIS**                                                                    **PLAINTIFF**

**v.**                                        **Case No. 4:16-cv-00833-KGB**

**ARKANSAS STATE POLICE**                                                       **DEFENDANT**

## OPINION AND ORDER

Plaintiff Mark H. Willis brings this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000-e ("Title VII"), alleging race discrimination. Defendant Arkansas State Police ("ASP") filed a motion for summary judgment (Dkt. No. 16). Mr. Willis has not responded to the ASP's motion. For the reasons that follow, the Court grants the ASP's motion for summary judgment (Dkt. No. 16).

### I.     Factual Background

Unless otherwise noted, the following facts are taken from the ASP's statement of undisputed material facts (Dkt. No. 18). Mr. Willis has not responded to the ASP's statement of undisputed material facts. Pursuant to Rule 56.1 of the Local Rules of the United States District Court for the Eastern and Western Districts of Arkansas, the Court deems admitted the ASP's statement of undisputed material facts.[1]

---

[1] Local Rule 56.1 provides that, if the nonmoving party opposes a motion for summary judgment, "it shall file, in addition to any response and brief, a separate, short and concise statement of the material facts as to which it contends a genuine dispute exists to be tried." Local Rule 56.1(b). Additionally, Local Rule 56.1 provides that, unless controverted by the nonmoving party's statement filed under paragraph (b) of the Rule, "[a]ll material facts set forth in the statement [of undisputed material facts] filed by the moving party . . . shall be deemed admitted." Local Rule 56.1(c).

Mr. Willis, an African-American, was hired as an employee of the ASP on September 5, 2014 (Dkt. No. 18, ¶¶ 1, 2). Mr. Willis worked as an ASP Trooper (Dkt. No. 18-11). Mr. Willis completed the ASP's training academy in December 2014 (Dkt. No. 18, ¶ 3).

On December 8, 2014, Mr. Willis was transferred to Troop F in Warren, Arkansas (*Id.*, ¶ 4). He attended the Troop F Field Training Program (*Id.*). Sergeant Alex Krneta—who is Caucasian—was the Field Training Supervisor (*Id.*, ¶¶ 5, 7). Sergeant Krneta supervised Troopers in both Ouachita and Union Counties (*Id.*, ¶ 6). Each Trooper is assigned to a single county, and Mr. Willis was assigned to Ouachita County (*Id.*, ¶¶ 8, 9). Sergeant Krneta supervised Mr. Willis from December 2014 until his termination in February 2016 (Dkt. No. 18, ¶ 10).

Upon his or her arrival at a Troop, a new Trooper participates in a Field Training Program (*Id.*, ¶ 11). The standard program lasts for eight weeks; however, if remedial training is needed, the program will last up to 12 weeks (*Id.*). Mr. Willis' training lasted 12 weeks, in order to further assist him in the area of crash investigations (*Id.*, ¶ 12).

During the training program, the new recruit works alongside a more experienced officer for hands-on training (*Id.,* ¶ 13). The Field Training Officer assists the new recruit in investigating incidents and accidents, gathering information, and preparing accurate documentation reflecting what occurred (*Id.*, ¶ 14). When an incident or accident occurs, the Trooper, or other ASP law enforcement official involved, will prepare a report to document what has occurred (Dkt. No. 18, ¶ 15). The report must be as accurate as possible so that, if it is needed in the future, such as for insurance purposes or litigation, the parties can rely on the information stated in the report as being truthful and accurate (*Id.*, ¶ 16). The Trooper is to enter all of the information into the computer in order to allow a written report to be generated (*Id.*, ¶ 17).

As Mr. Willis' supervisor, Sergeant Krneta reviewed Mr. Willis' incident and accident reports between December 2014 and February 2016 (*Id.*, ¶ 18). Sergeant Krneta was Mr. Willis' immediate supervisor; however, from time to time, other sergeants would review Mr. Willis' incident and accident reports (*Id.*, ¶ 19). Sergeant Gary Gambill and Sergeant Clayton Richardson also reviewed Mr. Willis' incident and accident reports during Mr. Willis' tenure with Troop F (*Id.*, ¶ 20). Sergeant Krneta could also review the reports of other Troopers who were not under his direct supervision (Dkt. No. 18, ¶ 21).

Part of Sergeant Krneta's job duties and responsibilities as sergeant was to review incident and accident reports submitted by the ASP Troopers under his supervision (*Id.*, ¶ 22). Sergeant Krneta does not pick and choose which officers' reports to review; he reviews them all (*Id.*). If an error has been made, the report will be "rejected." (*Id.*, ¶ 23). Upon receipt of a "rejected" report, the Trooper is to make the necessary changes and then resubmit the report for approval (*Id.*).

Sergeant Gambill was the first supervising sergeant to reject one of Mr. Willis' accident reports (*Id.*, ¶ 24). On December 20, 2014, Sergeant Gambill rejected Mr. Willis' Report No. 52121470 (Dkt. No. 18, ¶ 25). Sergeant Gambill emailed the rejected report to Corporal Sequoyah Browning (*Id.*). That week, Corporal Browning was Mr. Willis' Field Training Officer, and Mr. Willis was shadowing Corporal Browning as on-the-job training (*Id.*). Sergeant Gambill sent the rejected report to Corporal Browning to review with Mr. Willis (*Id.*). Corporal Browning is African-American (*Id.*, ¶ 26).

Mr. Willis shadowed approximately four different Field Training Officers during his 12 weeks of training with Troop F (*Id.*, ¶ 27). Once a report is "rejected," the Trooper is to correct the errors and resubmit it for approval (Dkt. No. 18, ¶ 28). Troopers do not receive a reprimand

or reduction in pay for a rejected report (*Id.*, ¶ 29).  The goal is to have a final report that is true and accurate and that can be relied on at a later date if needed (*Id.*).

Sergeant Krneta rejected one of Mr. Willis' reports—Report No. 52021506—on February 4, 2015, for errors contained in the report (*Id.*, ¶ 30).  Sergeant Krneta emailed a copy of the report to Billy Walker, Mr. Willis' Field Training Officer at that time (*Id.,* ¶ 30).  The purpose of returning the February 4, 2015, report to Mr. Walker was so that he could review the report with Mr. Willis, and together they could make the necessary changes (*Id.*, ¶ 31).  Mr. Walker is African-American (Dkt. No. 18, ¶ 32).  Because the Field Training Program is a learning experience for the new recruits, neither Mr. Walker nor Mr. Willis was reprimanded in any way for the "rejection" of the February 4, 2015, report (*Id.*, ¶¶ 33, 34).

On March 28, 2015, Sergeant Gambill rejected Mr. Willis' Report No. 52031523 (*Id.*, ¶ 35).  Sergeant Gambill emailed the rejected report to Mr. Willis, identifying eight different areas to correct (*Id.*).  On April 11, 2015, Sergeant Krneta rejected Mr. Willis' Report No. 52041524 (*Id.*, ¶ 36).  The report was rejected due to errors contained in the report (*Id.*).  Sergeant Krneta emailed Mr. Willis that day and attached a copy of the changes that needed to be made to the report (*Id.*).  Sergeant Krneta asked Mr. Willis to have the report re-submitted for approval by the end of his shift (*Id.*).  Changes to reports are expected to be re-submitted the same day the rejection is received, if the Trooper is working the day a rejection is sent (*Id.*, ¶ 37).  If the Trooper happens to be off when the report is rejected, then changes should be made as soon as the Trooper returns to work from his or her days off (*Id.*).  This is true for every Trooper, not just Mr. Willis (*Id.*).

On April 13, 2015, Sergeant Gambill received Mr. Willis' revised report No. 52041524 (*Id.*, ¶ 38).  Sergeant Gambill rejected the report due to errors that remained in the report (*Id.*).  On April 23, 2015, Sergeant Krneta met with Mr. Willis at the Camden Police Department for

approximately one hour to discuss Report No. 52041524 (*Id.*, ¶ 39). They reviewed the applicable errors on the Collision Report (*Id.*). They then carefully went over all of the necessary corrections that needed to be made (*Id.*). At the conclusion of the meeting, Mr. Willis acknowledged every aspect that had been discussed and assured Sergeant Krneta that his future performance in this area would improve (*Id.*).

On April 30, 2015, Sergeant Krneta received a Fatal Accident Report Form—ASP-25— from Mr. Willis ((*Id.*, ¶ 40). After reviewing the form, Sergeant Krneta noticed a number of significant errors (*Id.*). Sergeant Krneta contacted Mr. Willis by phone and explained the errors to him (*Id.*). Thereafter, Sergeant Krneta carefully went over all of the necessary corrections that needed to be made to the form (*Id.*). Sergeant Krneta's efforts were to assist Mr. Willis in understanding the errors that he had made and to teach him how to complete the report correctly the next time (*Id.*).

On May 1, 2015, Sergeant Krneta again met with Mr. Willis at the Camden Police Department to assist him in preparing Collision Report No. 52041533FM (Fatality Report) (*Id.*, ¶ 41). During the meeting, Sergeant Krneta reviewed the applicable errors on the Collision Report with Mr. Willis (*Id.*). Thereafter, they carefully went over all of the necessary corrections that needed to be made (*Id.*). During the meeting, Mr. Willis appeared to be confused regarding a number of aspects concerning crash scene mapping and diagraming (*Id.*). After approximately 2.5 hours of training, it was evident to Sergeant Krneta that Mr. Willis was having difficulties grasping the fundamentals of investigating a collision, despite his reassurances to Sergeant Krneta that he understood the material they had reviewed (*Id.*). On May 5, 2015, Captain Charles Hubbard, the Troop F Commander, asked Sergeant Krneta to outline the areas of deficiencies for Mr. Willis (*Id.*, ¶ 42).

On May 6, 2015, Sergeant Richardson arrived at the scene of a motor vehicle collision being investigated by Mr. Willis (*Id.*).  Mr. Willis was having difficulties mapping the crash scene (*Id.*).  As a result, Sergeant Richardson had to remain on scene and guide Mr. Willis on how to obtain properly crash scene measurements (*Id.*, ¶ 43).  Sergeant Richardson is African-American (*Id.*, ¶ 44).

On May 8, 2015, Sergeant Krneta prepared a memorandum to Captain Hubbard (*Id.*, ¶ 45). In it, Sergeant Krneta documented eight areas related to investigations that Mr. Willis needed to improve (*Id.*).  Sergeant Krneta recommended that Mr. Willis attend remedial training in the areas of Collision Investigation and Collision Report preparation (*Id.*).  Specifically, Sergeant Krneta recommended Corporal Jeff Hust, a Field Training Officer, be assigned to assist Mr. Willis in his investigations and report preparations (*Id.*).  Sergeant Krneta explained, in detail, the events that had transpired over the preceding two weeks regarding Mr. Willis' perceived difficulties in creating accurate reports (*Id.*).  Sergeant Krneta recommended the remedial training begin on May 12, 2015, and conclude on June 5, 2015 (*Id.*).

On May 9, 2015, Mr. Willis submitted Collision Report No. 52051535 (*Id.*, ¶ 46).  In spite of Sergeant Richardson's assistance, the report was submitted with various date element errors, narrative errors, and crash scene mapping and diagramming errors (*Id.*).

On May 12, 2015, Sergeant Krneta met with Captain Hubbard to discuss Mr. Willis (*Id.*, ¶ 47).  After a lengthy discussion, they agreed on Mr. Willis' deficiencies surrounding Collision Investigation and Collision Report preparation (*Id.*).  Captain Hubbard approved the Corrective Action Plan (*Id.*).  The goal of the Corrective Action Plan was to help Mr. Willis succeed (*Id.*, ¶ 48).

On May 29, 2015, Sergeant Krneta received a memorandum from Corporal Hust (*Id.*, ¶ 49). Corporal Hust indicated that, during his training with Mr. Willis, he felt that Mr. Willis had made progress in the area of obtaining measurements and diagramming the accidents, as well as progress in how to obtain and record information in an efficient and logical manner (*Id.*). Corporal Hust also indicated that the areas in which he felt Mr. Willis was weakest were the narration of the events of the crash, as well as the narration required to produce a diagram that is easily followed (*Id.*). Corporal Hust recommended Mr. Willis receive extensive training in the area of writing (*Id.*). Mr. Willis was released to work on his own again on May 30, 2015 (*Id.*, ¶ 50).

In May 2015, Sergeant Krneta found two of Mr. Willis' reports contained grammatical and vocabulary errors; however, Sergeant Krneta could see some improvement with the diagrams Mr. Willis was drawing (*Id.*, ¶ 51). Sergeant Krneta was hopeful that Mr. Willis' work product would continue to improve (*Id.*). On June 2, 2015, Sergeant Krneta met with Mr. Willis, Captain Hubbard, and Lieutenant Charles Watson at Troop F Headquarters (*Id.*, ¶ 52). They discussed Mr. Willis' prior deficiencies and the training that had taken place (*Id.*). Captain Hubbard asked Mr. Willis how he was feeling after training, and Mr. Willis said he was feeling more confident (*Id.*). Captain Hubbard asked Mr. Willis to let those at the meeting know if Mr. Willis had any suggestions on how they could better help him (*Id.*). Mr. Willis never offered any suggestions (*Id.*, ¶ 53). At the conclusion of the meeting, Captain Hubbard recommended that Mr. Willis return to Little Rock and attend classes in crash investigation and report writing with the Troop School (*Id.*, ¶ 54).

On June 8, 2015, Sergeant Krneta rejected Mr. Willis' Report No. 70061559 due to errors contained in the report (*Id.*, ¶ 55). On June 22, 2015, Sergeant Krneta rejected Mr. Willis' Report No. 52061540 due to errors contained in the report (*Id.*, ¶ 56). Sergeant Krneta sent him the

documents needed in order to make the necessary corrections (*Id.*). On June 24, 2015, Sergeant Krneta rejected Mr. Willis' Report No. 52061541 due to errors contained in the report (*Id.*, ¶ 57).

On July 1, 2015, Sergeant Krneta rejected two of Mr. Willis' reports—Report No. 52061542 and Incident Report F-6/15-0067—due to errors contained in the reports (*Id.*, ¶ 58). Sergeant Krneta sent Mr. Willis the documents needed in order to make the necessary corrections (*Id.*). Also on that date, Sergeant Krneta rejected an ASP-2 form completed incorrectly by Mr. Willis (*Id.*, ¶ 59).

On July 10, 2015, Major Mike Foster—Captain Hubbard's supervisor—ordered Mr. Willis to attend the third week of crash investigation classes beginning Monday, August 3, 2015, at Little Rock General Headquarters (*Id.*, ¶ 60). On July 17, 2015, Sergeant Krneta rejected Mr. Willis' Report No. 140715039 due to errors contained in the report ((*Id.*, ¶ 61). On August 15, 2015, Sergeant Krneta rejected Mr. Willis' Report No. 52081546 due to errors contained in the report (*Id.*, ¶ 62). Sergeant Krneta sent him the documents needed in order to make the necessary corrections (*Id.*).

On August 19, 2015, Sergeant Jamie Gravier, Corporal Greg Dycus, and Corporal Billy McCradic sent a memorandum to Major Foster regarding Mr. Willis' week in training with Troop School 2015A (*Id.*, ¶ 63). The conclusion they reached was as follows: "At this point, we are not comfortable saying that Trooper Willis is capable of investigating a crash and producing an acceptable report without assistance." (*Id.*).

On September 8, 2015, Sergeant Krneta rejected Mr. Willis' Report No. 20091537 due to errors contained in the report (*Id.*, ¶ 64). Sergeant Krneta explained the corrections that needed to be made in an email (*Id.*). Also on that date, Sergeant Krneta rejected Incident Report F-8/15-

0101 due to errors in the report (*Id.*, ¶ 65). Sergeant Krneta also rejected Report No. P-15-0064-HP-F for having the incorrect date of confiscation in the report (*Id.*, ¶ 66).

On September 28, 2015, Mr. Willis was involved in an automobile accident while in his ASP vehicle (*Id.*, ¶ 67). The following day, Mr. Willis sent Sergeant Krneta a memorandum regarding the accident, in which he denied fault (*Id.*). On September 30, 2015, Sergeant Krneta wrote a memorandum to Captain Hubbard pursuant to policy regarding the accident (*Id.*, ¶ 68). On October 1, 2015, Captain Hubbard authored a memorandum to his supervisor, Major Foster, regarding the accident (*Id.*, ¶ 69). On October 12, 2015, Major Foster wrote a letter to Mr. Willis which stated that the accident investigation had determined that the contributing factor of the automobile accident was the result of Mr. Willis' actions while operating an ASP vehicle (*Id.*, ¶ 70). Mr. Willis was notified that Major Foster was required to lodge a complaint against Mr. Willis in violation of ASP Police – General Section 23, Vehicle Use, for causing the accident (*Id.*, ¶ 71). The complaint was not in any way related to Mr. Willis' report writing or scene investigations (*Id.*, ¶ 72).

On November 12, 2015, the Command Staff Review Board met regarding the complaint filed against Mr. Willis regarding the September 28, 2015, automobile accident (*Id.*, ¶ 73). The Board unanimously found the complaint was founded (*Id.*). The members of the Command Staff Review Board were Major Shawn Garner, Major Ron Stayton, and Lieutenant Ron Casey (*Id.*, ¶ 74).

On November 13, 2015, Sergeant Krneta rejected Mr. Willis' Report No. 70111516M due to errors contained in the report (*Id.*, ¶ 75). Sergeant Krneta explained the corrections that needed to be made in an email (*Id.*).

On November 17, 2015, Captain Hubbard met with Mr. Willis and Sergeant Krneta regarding a November 11, 2015, crash investigation (*Id.*, ¶ 76). Captain Hubbard noticed several mistakes, as well as undocumented evidence and facts about the crash (*Id.*). The report contained inverted measurements as well as a narrative that did not match the diagram (*Id.*). Captain Hubbard then wrote a memorandum to Major Foster to update him on Captain Hubbard's meeting with Mr. Willis and Sergeant Krneta and on the continuing problems with Mr. Willis' report writing (*Id.*, ¶ 77).

On November 24, 2015, Lieutenant Colonel Tim K'Nuckles wrote a memorandum to Colonel Bill Bryant regarding the Office of Professional Standards investigation file into Mr. Willis' automobile accident (*Id.*, ¶ 78). The file was forwarded to Colonel Bryant's office for a final decision and disposition (*Id.*).

On December 28, 2015, Sergeant Krneta rejected Mr. Willis' Report No. 52121579 due to errors contained in the report (*Id.*, ¶ 79). Sergeant Krneta explained the corrections that needed to be made in an email (*Id.*). On December 30, 2015, Sergeant Krneta checked the eCrash server and noticed that Mr. Willis had not yet corrected report No. 52121579, which was returned to him two days prior (*Id.*, ¶ 80). Sergeant Krneta sent an email to Mr. Willis explaining, in great detail, why the ASP needed the report to be revised and uploaded (*Id.*).

On January 5, 2016, Sergeant Krneta rejected Mr. Willis' Incident Report No. F-12/15-0167 due to errors contained in the report (*Id.*, ¶ 81). Sergeant Krneta explained the corrections that needed to be made in an email (*Id.*). On January 12, 2016, Sergeant Krneta rejected Mr. Willis' Report No. 52011601 due to errors contained in the report (*Id.*, ¶ 82). Sergeant Krneta explained the corrections that needed to be made in an email (*Id.*). Sergeant Krneta forwarded a

copy of Mr. Willis' January 12, 2016, email and rejected report to Captain Hubbard on January 15, 2016 (*Id.*, ¶ 83).

On January 15, 2016, Mr. Willis investigated an accident and prepared Report No. 52011603 (*Id.*, ¶ 84). Sergeant Gambill reviewed and rejected the report (*Id.*). He identified the errors contained in the report and emailed the information to Mr. Willis (*Id.*).

On January 19, 2016, Captain Hubbard authored a memorandum to Major Foster outlining Troop F's exhaustive efforts to assist Mr. Willis in investigating and documenting crashes (*Id.*, ¶ 85). As of that date, Captain Hubbard felt that Mr. Willis was a detriment and a liability to the department (*Id.*, ¶ 86).

On January 21, 2016, Mr. Willis corrected and resubmitted Report No. 52011603; however, it was determined that a number of discrepancies brought to Mr. Willis' attention by Sergeant Gambill had not been corrected (*Id.*, ¶ 87).

On January 22, 2016, Sergeant Krneta met with Mr. Willis at the Camden ASP Office to follow up on Report No. 52011603 (*Id.*, ¶ 88). Sergeant Krneta addressed the discrepancies, as well as his other concerns regarding the traffic crash investigation, with Mr. Willis (*Id.*). During their conversation, Mr. Willis brought to Sergeant Krneta's attention that the driver whose actions contributed to the crash may have been under the influence (*Id.*). This information had been reported to Mr. Willis by a member of the hospital staff; however, this information was not contained anywhere in Mr. Willis' report (*Id.*). Sergeant Krneta explained to Mr. Willis what needed to be done in these circumstances going forward (*Id.*). Sergeant Krneta reported his meeting with Mr. Willis to Captain Hubbard (*Id.*, ¶ 89).

On January 23, 2016, Sergeant Richardson rejected Mr. Willis' Report No. 501304 due to errors contained in the report (*Id.*, ¶ 90). On January 28, 2016, Sergeant Krneta rejected Mr. Willis'

Report No. 52011605 due to errors contained in the report (*Id.*, ¶ 91). Sergeant Krneta explained the corrections that needed to be made in an email and asked him to resubmit his report (*Id.*, ¶92).

On February 6, 2016, Sergeant Krneta conducted an administrative review of Mr. Willis' in-car video recordings (*Id.*, ¶ 93). Administrative reviews of in-car video records are performed at least three times a month on each Trooper, as part of the ASP's bias-based policing policy (*Id.*). The review revealed that on January 30, 2016, Mr. Willis had initiated a traffic stop, during which time he discovered that the operator of the vehicle did not have a driver's license to operate a motor vehicle (*Id.*). Mr. Willis did not issue a citation or attempt to have someone else drive the vehicle away (*Id.*). Instead, he knowingly allowed the subject to assume control of the vehicle and leave the scene (*Id.*). Mr. Willis' conduct violated ASP Policy & Procedures (*Id.*). Sergeant Krneta reported the findings of the in-car video recordings to Captain Hubbard (*Id.*, ¶ 94). Captain Hubbard forwarded Sergeant Krneta's memorandum to Major Foster (*Id.*, ¶ 95).

On February 21, 2016, Sergeant Krneta rejected Mr. Willis' Report No. 52021608M due to errors contained in the report (*Id.*, ¶ 96). Sergeant Krneta explained the corrections that needed to be made in an email (*Id.*).

Mr. Willis was placed on administrative leave by Major Foster on February 25, 2016 (*Id.*, ¶ 97). On February 29, 2016, Colonel Bryant notified Mr. Willis, in writing, of his termination (*Id.*, ¶ 98). Sergeant Krneta did not terminate Mr. Willis, nor did he recommend that he be terminated (*Id.*, ¶ 99). Sergeant Krneta is not authorized to make employment recommendations regarding the officers he supervises (*Id.*, ¶ 100). He is only allowed to make training recommendations (*Id.*). Sergeant Krneta did not treat Mr. Willis any differently from other Troopers or law enforcement officers under his supervision (*Id.*, ¶ 101).

Mr. Willis was not the only Trooper to have ever had a report rejected; however, Sergeant Krneta has never worked with or heard of anyone having as many errors in each of their reports as Mr. Willis did (*Id.*, ¶ 102). Sergeant Krneta made every effort to assist Mr. Willis in his training (*Id.*, ¶ 103). The ASP took extra steps to help Mr. Willis with his training (*Id.*, ¶ 104). Sergeant Krneta reported Mr. Willis' progress, or lack thereof, to Captain Hubbard, their Troop Commander (*Id.*, ¶ 106). Mr. Willis' race was not a factor for Sergeant Krneta, and Sergeant Krneta did not take any actions in favor of or against Mr. Willis based upon his race (*Id.*, ¶ 105). Sergeant Krneta did not reject Mr. Willis' reports because of Mr. Willis' race (*Id.*, ¶ 107).

Mr. Willis was not denied the opportunity of working overtime (*Id.*, ¶ 108). On September 30, 2015, Sergeant Krneta sent an email to the nine employees—including Mr. Willis—under his supervision regarding overtime (*Id.*, ¶¶ 108, 109). Mr. Willis did not complete the appropriate documentation to work overtime (*Id.*, ¶ 110).

On or about March 15, 2016, Mr. Willis filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), claiming discrimination based on his race (Dkt. No. 18-11). In his charge, Mr. Willis states:

> I was hired September 5, 2014, as a Trooper. My Sergeant (White) has repeatedly not accepted my accident reports. I have retaken (and passed) the portion of training dealing with accident reports. I have had other officers review my reports before submitting them. They have all told me they look fine and have questioned me as to why the Sgt is giving me such a hard way to go. I was denied over-time with my Sgt citing a probationary employee can't receive it, yet my coworker (White) was allowed to work it. I was suspended on February 25 and discharged on February 29, 2015.
>
> I was [sic] that I'm still within my 18-month probation and that even after retraining, tutoring, and multiple supervisors I was still unable to prepare accident reports.
>
> I believe my reports were not received; I was denied overtime, suspended and discharged because of my race (Black) in violation of Title VII of the Civil Rights Act of 1964, as amended.

(*Id*.).  Mr. Willis was issued a Right to Sue letter on August 19, 2016 (Dkt. No. 6-1).

## II.      Standard Of Review

Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact and that the defendant is entitled to entry of judgment as a matter of law.  Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party.  *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008).  "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under the prevailing law."  *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989).  However, parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings.  *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984).  The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact.  *Celotex Corp.*, 477 U.S. at 323.  The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial.  *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 2008).  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

"There is no 'discrimination case exception' to the application of summary judgment, which is a useful pretrial tool to determine whether any case, including one alleging discrimination, merits a trial."  *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc) (citing *Fercello v. Cnty. of Ramsey*, 612 F.3d 1069, 1077 (8th Cir. 2010) (quoting *Berg v. Norand Corp.*, 169 F.3d 1140, 1144 (8th Cir. 1999)) (citing *Wallace v. DTG Operations, Inc.*, 442 F.3d

1112, 1118 (8th Cir. 2006))). Accordingly, this Court applies the same summary judgment standard to discrimination cases as it does to all others.

## III. Race Discrimination Claim

Mr. Willis brings a claim of race discrimination in violation of Title VII. Mr. Willis can establish a *prima facie* case of race discrimination either by providing direct evidence of discrimination or by creating an inference of unlawful discrimination under the three-step analysis set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Bone v. G4S Youth Services, LLC*, 686 F.3d 948, 953 (8th Cir. 2012). For the following reasons, the ASP is entitled to summary judgment in its favor on Mr. Willis' race discrimination claim.

### A. Direct Evidence Analysis

Direct evidence is evidence "showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated" the adverse employment action. *Torgerson,* 643 F.3d at 1044 (quoting *Thomas v. First Nat'l Bank of Wynne,* 111 F.3d 64, 66 (8th Cir. 1997)). Therefore, "direct" refers to the causal strength of the proof, not whether it is "circumstantial" evidence. *Id.* A plaintiff with strong direct evidence that illegal discrimination motivated the employer's adverse action does not need the three-part *McDonnell Douglas* analysis to get to the jury, irrespective of whether his strong evidence is circumstantial. *Id.* However, "if the plaintiff lacks evidence that clearly points to the presence of an illegal motive, he must avoid summary judgment by creating the requisite inference of unlawful discrimination through the *McDonnell Douglas* analysis, including sufficient evidence of pretext." *Id.*

"To be entitled to direct evidence analysis, the plaintiff must present evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude sufficient to permit the fact finder to infer that that

attitude was more likely than not a motivating factor in the employer's decision." *Rivers-Frison v. Se. Mo. Cmty. Treatment Ctr.*, 133 F.3d 616, 619 (8th Cir. 1998) (internal quotation marks omitted). Mr. Willis has presented no direct evidence of discrimination in support of his claim. Accordingly, the Court will proceed through the *McDonnell Douglas* analysis.

### B. *McDonnell Douglas* Analysis

Under the *McDonnell Douglas* analysis, "the plaintiff bears the burden of establishing a *prima facie* case of discrimination." *McGinnis v. Union Pac. R.R.*, 496 F.3d 868, 873 (8th Cir. 2007). To establish a *prima facie* case of race discrimination based on his complaints of different treatment and termination, Mr. Willis must show that: "(1) he is a member of a protected class, (2) he met his employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) the circumstances give rise to an inference of discrimination (for example, similarly situated employees outside the protected class were treated differently)." *Young v. Builders Steel Co.*, 754 F.3d 573, 577 (8th Cir. 2014) (quoting *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 853-54 (8th Cir. 2012)). If an employee carries his burden of establishing a *prima facie* case of discrimination, the burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Id.* at 577-78. "If the employer meets this burden of production, the employee must then 'prove by a preponderance of the evidence that the legitimate reasons offered by the employer were not its true reasons, but were a pretext for discrimination.'" *Rooney v. Rock-Tenn Converting Co.*, 878 F.3d 1111, 1115-1116 (8th Cir. 2018) (quoting *Grant v. City of Blytheville, Ark.*, 841 F.3d 767, 773 (8th Cir. 2016)). The plaintiff must show the defendant's proffered reason is pretextual and that unlawful discrimination was the true reason for the adverse employment action. *Tyler v. Univ. of Ark. Bd. of Trustees*, 628 F.3d 980, 990 (8thCir.

2011). Pretext may be demonstrated by different means. *See, e.g., Roxas v. Presentation College*, 90 F.3d 310, 316 (8th Cir. 1996).

### 1. *Prima Facie* Case

It is undisputed that Mr. Willis can satisfy the first and third prongs of his *prima facie* case (Dkt. No. 17, at 17). He is a member of a protected class, and the ASP terminated his employment. However, the ASP disputes that Mr. Willis was meeting the ASP's legitimate job expectations so as to satisfy the second prong of the analysis. The ASP further contends that, under the fourth prong, the record evidence does not give rise to an inference of discrimination.

As for the second prong of the analysis, "[t]he standard for assessing performance 'is not that of the ideal employee, but rather what the employer could legitimately expect.'" *Calder v. TCI Cablevision of Mo., Inc.*, 298 F.3d 723, 729 (8th Cir. 2012) (quoting *Keathley v. Ameritech Corp.*, 187 F.3d 915, 920 (8th Cir. 1999)). Mr. Willis must do more than insist that he was a good employee or that others thought he was a good employee. *See Cherry v. Ritenour Sch. Dist.*, 253 F.Supp.2d 1085, 1095 (E.D. Mo. 2003) (collecting cases). He "must show by independent evidence in the summary judgment record that he 'was actually performing' his job at the level specified by Defendant." *Cherry*, 253 F.Supp.2d at 1095 (quoting *Whitley v. Peer Review Sys., Inc.*, 221 F.3d 1053, 1055 (8th Cir. 2000)).

In his complaint, Mr. Willis contends that he had been a law enforcement officer for 27 years. He asserts that his prior work for the Arkansas Highway Police involved issuing accident reports (Dkt. No. 6, ¶¶ 12, 13). He alleges that he did that work satisfactorily (*Id.*, ¶ 12). Mr. Willis alleges further that, when he was given accident report retraining at the ASP, the officer who gave him the refresher training told Mr. Willis that he completed the accident reports correctly (*Id.*, ¶ 14). He maintains that the accident reports rejected by the "white sergeant" were completed

in conformity with the training he received (*Id.*). He contends that the sergeant falsely claimed that Mr. Willis made errors in his accident reports (*Id.*, ¶ 13). He alleges that he was terminated "but the Arkansas Board of Review found that his termination was not for misconduct connected with his work" (*Id.*, ¶ 7).

The "[f]ederal courts do not sit as a super-personnel department that reexamines an entity's business decisions." *Torlowei v. Target*, 401 F.3d 933, 935 (8th Cir. 2005) (quoting *Wilking v. County of Ramsey*, 153 F.3d 869, 873 (8th Cir. 1998)). The undisputed record evidence before the Court demonstrates that Mr. Willis attended the ASP training academy for three months before he was transferred to Troop F in Warren, Arkansas, to begin his field training program. Mr. Willis' training in the field program lasted 12 weeks. The record reflects that Mr. Willis then received one-on-one counseling from his supervisor—Sergeant Krneta—in addition to three weeks of remedial training from Corporal Hust and one week of academy training on crash investigations and report writing (Dkt. No. 17, at 19). The ASP contends that, despite the six months of training, Mr. Willis continued to make errors in his reporting of incidents and accidents (*Id.*). The ASP contends that it was only then that Captain Hubbard and Major Foster came to the conclusion that Mr. Willis was not qualified and not capable of carrying out his job duties as an ASP Trooper. Mr. Willis presents no record evidence to dispute this.

Based on the record evidence, construing all reasonable inferences in favor of Mr. Willis, the Court determines that no reasonable juror could conclude that Mr. Willis was meeting his employer's legitimate job expectations, and thus, he fails to satisfy the second element of his *prima facie* case. As a result, Mr. Willis is unable to establish a *prima facie* case for race discrimination.

Even if Mr. Willis could establish this element of his *prima facie* case, he still must show circumstances which would give rise to an inference of discrimination. To satisfy this fourth

prong, Mr. Willis must set forth evidence sufficient to show that he and other similarly situated employees were "involved in or accused of the same or similar conduct and [were] disciplined in different ways." *Jones v. City of St. Louis,* 825 F.3d 476, 481 (8th Cir. 2016) (citing *Chappell v. Bilco Co*., 675 F.3d 1110, 1118 (8th Cir. 2012)). The Eighth Circuit Court of Appeals has set a "'low threshold' for employees to be considered similarly situated" at the *prima facie* stage, "requiring only that the employees 'are involved in or accused of the same or similar conduct and are disciplined in different ways.'" *Orr v. City of Rogers*, 232 F. Supp. 3d 1052, 1063 (W.D. Ark. 2017) (quoting *Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 851 (8th Cir. 2005) (abrogated in part)). Mr. Willis fails to set forth such evidence.

In his operative complaint, Mr. Willis contends that "[w]hite officers who did similar work were not punished by the white sergeant." (Dkt. No. 6, ¶ 9). He contends that he was supervised by a Caucasian trooper who treated him differently than Caucasian troopers under the same supervision regarding the completeness of accident reports (*Id.*, ¶ 10). He contends that other African-American officers told Mr. Willis that the Caucasian sergeant had racial bias (*Id*., ¶ 11). Mr. Willis further asserts in his charge of discrimination that he was denied the opportunity to work overtime on account of his race (Dkt. No. 18-11). He asserts that his sergeant informed him that probationary employees could not work overtime but then allowed Mr. Willis' Caucasian coworker to work overtime (*Id*.).

Aside from the assertions in Mr. Willis' complaint, which are not verified or sworn to by Mr. Willis or others, Mr. Willis has offered no record evidence to the Court that similarly situated employees outside the protected class were treated differently. Mr. Willis offers no potential comparators in his complaint. He names no similarly situated officers by name nor is there evidence in the record from which the Court can determine to whom Mr. Willis refers in his

complaint. Mr. Willis provides no record evidence regarding the circumstances of alleged different treatment of Caucasian officers similarly situated to him. Furthermore, in regard to Mr. Willis' assertion that he was denied the opportunity to work overtime, the record evidence before the Court reflects that Mr. Willis failed to complete the necessary paperwork that would have allowed him to work overtime (Dkt. No. 17, at 22). For these reasons, the Court determines that no reasonable juror could conclude that the record evidence gives rise to an inference of discrimination. Mr. Willis fails to establish the fourth prong of his *prima facie* case.

### 2. Legitimate, Nondiscriminatory Reason For Termination

If a plaintiff establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for firing the plaintiff. *See Twymon v. Wells Fargo & Co*., 462 F.3d 925, 934 (8th Cir. 2006) (shifting the burden to defendant to provide a legitimate, non-discriminatory reason for plaintiff's termination where plaintiff makes out a *prima facie* case of discrimination). The burden of production placed upon a moving party "is not onerous and the showing need not be made by a preponderance of the evidence." *Stallings v. Hussmann Corp.,* 447 F.3d 1041, 1051–52 (8th Cir. 2006) (quoting *Wallace v. Sparks Health Sys.,* 415 F.3d 853, 860 (8th Cir. 2005)); *accord Rodgers*, 417 F.3d at 853; *see also Kratzer v. Rockwell Collins, Inc.,* 398 F.3d 1040, 1046 (8th Cir. 2005) ("This is a burden of production not proof. The defendant need not persuade the court, it must simply provide evidence sufficient to sustain a judgment in its favor." (quoting *Krenik v. County of Le Sueur,* 47 F.3d 953, 958 (8th Cir.1995))).

The ASP has done this. The ASP submits that Mr. Willis was unable to perform the necessary duties of crash investigations and report writing during his ASP employment, despite having received additional remedial training (Dkt. No. 17, at 22). The ASP submits that Mr. Willis' incident and accident reports were rejected a total of 27 times beginning on December 20,

2014, and ending on February 21, 2016 (*Id.*, at 20-21).  The ASP notes that those rejections began

in advance of the period of alleged discrimination identified in Mr. Willis' EEOC charge and that

the reports were rejected by multiple supervising sergeants (*Id.*).  The ASP cites to Mr. Willis'

continued errors in reporting of incidents and accidents despite his remedial training as the reason

for his placement on administrative leave and his ultimate termination.  Mr. Willis' reports were

rejected for errors including misidentification of accident intersections, direction of traveling

vehicles, and identification of the officer; errors in the report narratives; contradictory information;

incorrect report numbers; and inaccurate vehicle descriptions (*Id.*, at 21).  The Eighth Circuit Court

of Appeals has repeatedly held that violation of company policy or procedures is a legitimate

reason for termination.  *See Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1135 (8th Cir. 1999);

*Price v. S-B Power Tool*, 75 F.3d 362, 365 (8th Cir. 1996); *Lidge-Myrtil v. Deere & Co.*, 49 F.3d

1308, 1310-11 (8th Cir. 1995).  The Court finds that the ASP has articulated a legitimate,

nondiscriminatory reason for Mr. Willis' termination.

### 3.      Pretext

Even if Mr. Willis could establish a *prima facie* case, he cannot demonstrate that the ASP's

proffered reason for terminating him was a pretext for race discrimination.  Because the ASP

provided a legitimate, non-discriminatory reason for Mr. Willis' termination, the burden returns to

Mr. Willis to present evidence that the reasons offered by the ASP are a pretext for discrimination.

*Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).  To prove pretext, Mr. Willis

must both discredit the ASP's asserted reason for termination and show that the circumstances

permit drawing the reasonable inference that the real reason for terminating him was his race.

*Johnson v. AT&T Corp.*, 422 F.3d 756, 763 (8th Cir. 2005).  Mr. Willis offers no evidence that the

reasons presented by the ASP are pretext.  He presents no comparator evidence.  The Court

concludes that, based on the record evidence, no reasonable juror could find in favor of Mr. Willis on the question of pretext.

**IV.     Conclusion**

The ASP is entitled to judgment as a matter of law in its favor on Mr. Willis' claim of race discrimination.  The Court grants the ASP's motion for summary judgment and enters judgment in favor of the ASP on Mr. Willis' discrimination claim (Dkt. No. 16).  Mr. Willis' claim is hereby dismissed with prejudice.  Judgment will be entered accordingly.

So ordered this 13th day of August, 2018.

Kristine G. Baker
United States District Judge